22, 11, 65, Irvine versus Smith. Mr. Whenever you're ready. May it please the court. My name is Andrew Freifeld. I represent petitioner appellant Moses Irvin. My first contact with this case was after the certificate of appeal ability was issued and I was appointed. I'd like to begin my argument by addressing the issue of alleged harmlessness regarding the Sir Watt issue. According to respondent, any error with respect to the admission of the Laguna's grand jury testimony was harmless because the testimonies of Laguna's and Acosta were squarely alike, including that Gonzalez was shot at close range. Respondent must acknowledge that the only reasonable inference from the Laguna's grand jury testimony is that the gun was literally inches from Gonzalez's face. That's appendix 313 through 14 and that Acosta testified that Gonzalez was shot at the very moment that he pulled away from the shooter's clutches. That's appendix 423. In arguing that the error cannot be deemed harmless in our brief, we relied in great part on the testimony of the medical examiner who testified that if the gun was shot at close or even intermediate range, then one performing an autopsy would expect to find fouling or stippling around the entrance wound produced by the bullet. But that he in performing the autopsy found none. He testified that he considers intermediate range to be about 18 inches. All of that testimony is at appendix 360 through 365. Critically, respondent completely ignores this argument in its brief. That is the testimony concerning the absence of fouling or stripling when wholly addressed in his brief. Second, and this argument has some overlap with the Brady issue, respondent urges that there is no chance of mistaken identity here because the identifications by Laguna's and Acosta corroborate one another. However, Acosta testified that a day or two after the shooting, he called the police tip line and reported the shooting. The prosecution represented that there was only one call to the tip line and that it was the day following the shooting. Make no mistake about it, that means that the call came from Acosta. And the evidence is undisputed that the caller suggested that two persons that go by the name of Slice or Dice did the shooting. And there's no dispute that Irving is not Slice or Dice. But to the extent that the phone tip is useful as impeachment of Acosta, you got to do that or your predecessor got to use it that way by cross-examining Acosta about it, right? I disagree with that for the following reason. Acosta was dismissed from the stand when this Brady issue arose. And the court said to defense counsel, you can recall Acosta if something comes up from the tip line. So he was in the middle of this cross-examination, arguably. When the prosecutor finds out about this information from the tip line, he alerts the handler of the witness to the existence of this call and that someone named Slice or Dice was alleged to be the shooter. Find out from the witness if he said anything about Slice or Dice. And he said that he didn't, okay? He should have been able to cross-examine, to confront him with that and not have, that's number one. Wait, wait, what? Didn't he get? I'm sorry. Maybe I misunderstand the facts, so correct me if I'm wrong. I thought that first there was a continuance granted to enable the defense. Maybe it wasn't long enough in your view. I understand that. But there was time to assimilate this information. And then after that, Mr. Acosta was recalled to the stand and did get cross-examined and confronted precisely about this issue. Yes. Am I wrong about either of those things? That there was a continuance and that there was a recall of Acosta and he was cross-examined about this? Yes, you're correct. During the continuance, the prosecutor reached out to the witness and said, when you return to the stand, you're going to be confronted with something where they're going to claim that you said it was Slice or Dice. Did you say that? He was given an opportunity to reflect on what was going to be the cross-examination. And as I argue in my brief, he was likely told, if you say that you claim that it was Slice or Dice on this phone call, we're going to lose this case. So then when he got confronted, he goes, I don't know. The prosecutor actually obstructed justice in connection with coaching the witness to say something that was untrue. The facts aren't. Under the threat that he would lose the case, the prosecutor would lose the case if the witness didn't give that specific testimony. I'm not claiming that. No, I didn't think so. I didn't think you'd want to. I'm not claiming that. But if that did not happen then, what we are confronted with is the witness. There is reasonable grounds to believe, at the very least, that this witness called the tip line and said something that was inconsistent with the testimony that he gave at trial. And the defense became aware of that call almost as soon as the prosecutor became aware of that call. And then had the opportunity to confront the witness about that rather obvious inconsistency. Now, maybe we're backing into this whole story, and maybe this is why it's coming up this way, on why it is important that the other witness's grand jury testimony came into the case, not specifically on the Brady argument itself. But if we're talking about the Brady argument itself, I have trouble seeing the prejudice when there was a reasonably prompt disclosure to the defense, and the defense then got to use this call against the witness who purportedly made it. And rather strongly, because it's pretty – I would think most jurors would think, hey, he probably made this call by the time this is all over. And he denied it under oath. But anyway. Okay, let me address a couple of points there, please. It wasn't the prosecutor who spoke with the witness over the adjournment, over the continuous. He had his police officer speak to the witness. He never spoke to him. Okay, so the officer did the obstruction of justice. It's certainly – he doesn't know what duty he may or may not have, whereas the prosecutor knows his duty, so it makes it more likely. There's a more important point that I want to make on how the prosecution undid my client's ability to take advantage of the disclosure of the Brady information. By the way, it was disclosed six years later, so I would dispute whether it was reasonably timely under any circumstances. The police knew about it, but the prosecutor didn't until six years after it happened. That said, Judge, this is critical. So let me make this point, please. The witness testified. When I called 911 – when I called the tip line, they gave me a number and assigned a number to the call that I could then use in order to – in case I want to collect a reward later on. That was his testimony. The prosecutor comes in following the continuance, and he says to the court, you know, you know that it wasn't him because I spoke to the tip line people, and the tip line people told me they don't give out the serial number the first time. It's only if the information that you give pans out that they give out a serial number. Then he had his police officer get on the stand and say, oh, I'm very familiar with how the tip line works. This police officer was retired for two years. I'm very familiar with how the tip line works. They don't give out a serial number the first time. So the process – Now we have another lie by Acosta that is exposed to the jury. No, not – no. No, this is a lie by the police officer. I submit that he said he knew that I'm familiar with how the tip line works, and they don't give out the serial number. So we have at a minimum a contradiction between the police officer and the witness, Acosta. Yes. So what the – however, in summation, the prosecutor got up and said, you know that Acosta's mistaken, that this wasn't that call because he said he got the serial number, and now you know from the police officer that they don't give out a serial number until the second or third call. Okay? Judge, in my brief, I'm about to hit the point on the head, which I haven't done yet. In my brief, I argued it doesn't make sense that they don't give out a serial number the first time because if the person wants to collect the reward, how can they prove that they're the person who made the call the first time? In their brief, they talked about the website for the tip line. I looked it up. I argued in my reply brief. It says we give out the serial number the very first time. It says it on the 911 website – excuse me, on the tip line, Crime Stoppers website. We give out the serial number the first time. Of course they do. Of course they do because the person needs the serial number in order to possibly collect the second time. The reason that my client was not able to take advantage of this exculpatory – excuse me, inculpatory information – and again, I'm still arguing harmlessness here, as Your Honor observed. Harmlessness on the surroi issue. Maybe we should get to the merits of the surroi issue then because – I know, but time's up. It never occurred to me to think that harmless error was the answer to the surroi issue. Well, they argued it extensively, Judge. They argued it extensively. They argued that we have two witnesses, so there's no case of mistaken identity. So you shouldn't have to worry. So he got up in summation, as I said. Why is it clearly erroneous to get to the heart of the surroi issue? Why is it clearly erroneous to find as a matter of fact that it was reasonably likely that surroi did not – that Lagunas did not testify because he was afraid of the defense? Judge, he was deported. He was in Mexico. The reason he didn't testify was because he got deported and he was in Mexico, and he wasn't coming back to come in and testify. There's no evidence that they said to him, you know, we'll take care of you, we'll protect you, we'll put you up. He was in Mexico for six years. If I was going to make up a hypothetical on why surroi fails, even though there were threats, I would say the guy got deported. He was 3,000 miles away. He was nowhere. That's the reason that he didn't testify. That is a reason why he didn't testify. Okay. There's nothing else to support, I submit. There's nothing else to support the conclusion that he didn't testify because – He said he was going to come back because he was scared. He was scared. Yeah. And that was the second call. The first call he said I'm not coming back because I was deported. There's a reasonable inference to be made, and I think it's the only reasonable inference, that he was scared because he was going to get deported again. Well, of course he was going to get deported again. He was going to be allowed to come back in and testify and then sent back to Mexico. There's no evidence that he was ever told any of that. The evidence of his not testifying because he was scared is so thin. It's razor, razor thin. And my argument is that – A, he said he's scared. B, he had every reason to be scared because someone threatened to cut his throat and explicitly told him that the same thing will happen to you, according to his testimony, the same thing will happen to you that happened to the victim about whom you were going to testify. He took that so seriously that it backfired, and his immediate response was to go to the police and for the first time tell the story of what he had allegedly seen. Yeah, meanwhile, he was completely cooperative. He went in front of the grand jury. He went and did the lineup. He went and reported the crime. There was nothing to show that he was scared except three years after the fact, a single sentence that he said. And my argument is that it's just too thin to make that conclusion, Judge. He was deported. Thank you, counsel. We'll hear from the jury. Thank you. May it please the court, Robert McIvor on behalf of the Office of the New York State Attorney General and respondent. In this case, the state courts expressly found that Petitioner threatened Laguna's life and that these threats scared him and caused his unavailability at trial. AEDPA and the Supreme Court require that this court defer to those factual findings. In the appellate division, Petitioner argued that Laguna's disappearance was susceptible to competing inferences, but under AEDPA, it's not enough to urge this court to draw new inferences. Rather, Petitioner must show that the state court's findings were unreasonable and that fair-minded jurists could not arrive at that conclusion. Here, the state court conclusions were reasonable and they were amply supported by the record. It's our argument that there is no error here, so obviously this court need not reach the issue of harmlessness. With respect to deportation, that was something that was expressly considered by Judge Gross. He asked the assistant district attorney about that, and the issue with respect to deportation was that given Laguna's reason to be scared, which is two weeks of escalating threats, the kind of thing that would stay with an individual for the rest of their life, he then stated that he was scared and was not going to return and gave that expressed reason for not returning. It was clear to all individuals on that phone call that the fear was the reason he was not returning. And the state court had good reason to believe that deportation was not a considerable factor because Laguna's had re-entered the country several times following his initial deportation. In addition, my friend argues that the people didn't offer anything to the people. They did extend an offer of a U visa, which would have allowed him to legally re-enter the country for the purposes of cooperating. It's not entirely clear that he received that information, but Laguna's returned the phone call subsequently, so it's a fair inference that the state court could have drawn, in addition to the fact that the obvious explanation was the death threats and the abduction and the fact that deportation pales in comparison. In addition to that, Laguna's cooperation with the grand jury was fleeting, and it was only after ADA DiMaggio reassured him that it was a secret proceeding. And at that, ADA DiMaggio testified that Laguna's did not want an order of protection, that indicated that he didn't want his name to be out there. That was the reason he gave ADA DiMaggio. The state court reasonably believed that the brief period of cooperation of these secret proceedings did not demonstrate the overall willingness to participate. If there are no further questions on that, I'm happy to address the Brady point with respect to the prosecutor's actions. I think my friend is misconstruing the court's ruling. That takes place on Appendix Site 447. That contemplated an investigation. The court instructed the people to ascertain whether a phone call exists and then said in the event there is a recording and the defendant wants to recall him, then he would be permitted to do so. And so there are two contingencies there, one of which was not met because there was no recording because Crimestoppers does not record the call. So it wasn't clear that Acosta was going to be recalled at that juncture and communications with him were proper. The prosecutor also has an ethical obligation faced with these allegations to make sure that they're prosecuting the right person. They can't wait and say, let's see how this plays out on cross-examine. And as Your Honor mentioned earlier, the defense still used that in an effective way. They asked Petitioner about whether they had any sort of communications with the people. And they insinuated to the jury that the people were feeding him that answer. And ultimately the jury rejected that. Can I ask, I'm just trying to understand, why did this take six years? I mean, that seems to complicate some of these issues, the passage of time. The six-year disclosure or the overall delay? The delay in the trial. The delay in the trial is because the people had lost their primary witness. Acosta had a series of problems, personal problems, legal problems.  I think there were things that the people would have liked to have done differently with the benefit of hindsight. But the fact remains, this is sometimes the nature of dealing with an uncooperative witness. When they lost contact with him, they tried to recontact him dozens of times. There was considerable motion practice in this case, including two speedy trial motions, omnibus motions, and a suppression motion. And the people also tried, having lost contact with their witness, to make it an evidence-based prosecution and sought out the DNA evidence, which ultimately did not bear fruit. But they were pursuing other avenues. And what is the state sort of obligation to try to get a witness? I just want to try to understand, to the extent you can help, where that line is. Thank you, Your Honor. There is no case mandating some sort of due diligence within the forfeiture analysis. There's no case mandating good faith efforts. But the standard here is whether there's adequate factual support that petitioner caused the unavailability by threats or chicanery. So I think necessarily, or in the overwhelming majority of cases, more often than not, that's going to generally require similar proof. They should have to make the showing under Giles and in New York under people v. Jirasi, which requires they do it by clear and convincing evidence. So most of their, there are hard and fast rules with respect to the people's requirements in order to demonstrate, say, due diligence or good faith. But they have to meet their burden through that, which usually requires them to show causation, a causal nexus between the threats and the unavailability and the witness's state of mind. The requirement of, say, a specific showing that the people should have to make on that front, I think, is in tension with the broader nature of forfeiture, which is to prevent the defendant or the petitioner from benefiting from their wrongdoing. And in any event here, there were adequate efforts that were made. The people made dozens of phone calls. They extended the U visa. They sent the Department of Justice down to Mexico on two occasions in 2010. The petitioner's intimidation, it hindered those efforts. And so I think that they have met any relevant standard here, I am happy to address the reference number issue. That doesn't affect materiality in this case for two distinct reasons. The first is that it is not relevant to their theory of prejudice. In the trial court, in the appellate division, in the district court, and in their opening brief, petitioner argued that delayed disclosure prevented them from investigating the call and from obtaining a recording or other information from Crimestoppers. That's unrelated to arguments advanced by the people in the first time. And in any event, it didn't deprive petitioner of the effective use. Counsel was able to ask about the call. He was able to ask about the reference number. And counsel could argue at trial that the people's explanation made no sense. I should note that the people made that argument for the first time on April 12th at the adjournment. It wasn't advanced in front of the jury for the first time. So counsel was in a position to do what everybody has done at this stage, which is call Crimestoppers or otherwise figure out through the Internet whether that is the proper procedure or simply through logic and reason argue that the people's explanation doesn't make sense given the broader anonymous nature of Crimestoppers. I'm happy to address anything else that the court is interested in. Otherwise, I will rest on my brief and ask that this court affirm. Thank you, counsel. Thank you very much. Defendant filed an omnibus motion. That's what made this take six years, as I understood part of my adversary's argument. They waited three years to even bother looking for Lagunas. It was already three years had already elapsed. When the judge said, I'm going to release this guy unless you tell me you're going to state ready at some point, which ultimately happened, that's the only reason they started trying to find out where Lagunas was. Their efforts to reach him lasted about a month or two. Is this a speedy trial argument or what kind of argument is this? I'm responding, I'm trying to explain why six years elapsed before the case went to trial. The other, no, it's not a speedy trial. But if they had Acosta, maybe they could have gone to trial with only Acosta. Yeah, I thought that the argument didn't make sense. They didn't really have Acosta, so they were, then they tried other means. They were hedging their bet. Why didn't they make the Sirwa motion on the Lagunas testimony right away? Why did they need to? Why did they need to make it before- Because they could wait six years. Because they could wait six years. That's why they didn't need to. That's the substance of my argument in response to that. But why does this bear on the Sirwa argument, the merits of the Sirwa argument? I'm having trouble. You know, I continue to maintain, despite my arbitrary argument, that the evidence is incredibly thin of why Lagunas did not testify at the trial. The only evidence that they have is one telephone call in 2009, three years after the trial, about where he said he was scared. There was no other evidence to support that, is my argument. And then, even when he said, I'm scared, they still didn't try to bring the case to trial for another three years. That's the substance. And they never tried reaching him again, and they didn't bring a Sirwa motion. They only brought the Sirwa motion when Acosta suddenly appeared in Las Vegas because he was in jail. Okay. Thank you, counsel. All right. I see my time's up. Thank you. Thank you both. We'll take the case under advisement.